1

2          IN THE UNITED STATES DISTRICT COURT

3          FOR THE NORTHERN DISTRICT OF CALIFORNIA

4

5   ANTOINE ARDDS,                         )   No. C 08-4514 SBA (PR)
                                           )
6              Petitioner,                 )   **ORDER DENYING PETITION FOR**
                                           )   **WRIT OF HABEAS CORPUS**
7        v.                                )
                                           )
8   M.S. EVANS, Warden,                    )
                                           )
9              Respondent.                 )
    _____)

10

11                          **INTRODUCTION**

12          This matter is now before the Court for consideration of Petitioner's <u>pro se</u> petition for a writ

13   of habeas corpus under 28 U.S.C. § 2254 challenging his 2005 conviction in Alameda County

14   Superior Court.  Respondent M.S. Evans, Warden of Salinas Valley State Prison, opposes the

15   petition.  Petitioner has filed a traverse.  For the reasons discussed below, the petition is DENIED as

16   to all claims.

17                          **BACKGROUND**

18   **I.    Case History**

19          On July 20, 2005, a jury in Alameda County Superior Court convicted Petitioner of the

20   following crimes arising out of two separate incidents that occurred in 1997 and 2003: kidnaping

21   with intent to commit rape (Cal. Pen. Code § 207(a)); five counts of forcible rape (Cal. Pen. Code §

22   261(a)(2)); four counts of forcible oral copulation (Cal. Pen. Code § 288a(c)(2)); sodomy by use of

23   force (Cal. Pen. Code § 286(c)(2)); possession of a firearm by a felon (Cal. Pen. Code §

24   12021(a)(1)).  The jury found true allegations of personal use of firearm and committing sex

25   offenses against multiple victims.  (Resp't Ex. A at 609-11; Ex. B at 925-37.)

26          On October 28, 2005, the trial court sentenced Petitioner to a term of 13 years and 8 months

27   in state prison and a consecutive term of 25 years to life in state prison.  (Resp't Ex. A at 669-72,

28   688-94; Ex. B at 940-52.)

In an unpublished opinion dated July 27, 2007, the California Court of Appeal reversed the conviction for kidnaping as time-barred, but otherwise affirmed the judgment.  (Resp't. Ex. E.)  The California Supreme Court denied a petition for review on October 10, 2007.  (Resp't Ex. G.)

The instant petition was filed on September 26, 2008.  On April 28, 2009, Respondent was ordered to show cause.  Respondent filed an answer and memorandum of points and authorities on August 21, 2009, and lodged a number of exhibits.  Petitioner filed a traverse on September 15, 2009.

II.    **Statement of Facts**

The following facts are taken from the opinion of the California Court of Appeal:

**The 1997 Incident**

The prosecution contended defendant attacked and raped Diane Doe in the early morning hours in Oakland, California, in 1997. Defendant was arrested some years later as the result of a DNA analysis.

**Diane Doe's Testimony**

Diane, 44 years old at the time of the trial, testified that she lived with her husband and three children in Oakland in June 1997. She went to a friend's house on the evening of June 19, where she and three other women "played dominoes, drank, [and] got high" on crack cocaine throughout the night. At the time, she used crack cocaine twice a week and had been a drug user for about 10 years.

Early the next morning, as Diane walked home alone, a man grabbed her from behind, choking her so she could not speak, and dragged her about a block to a more secluded dirt area, where he beat and raped her. She fought with him, and lost and regained consciousness, as he continued to rape her until he jumped up and ran away.

Diane testified about a taped statement she made with the police in 1997, soon after this assault. She acknowledged she lied in the interview when she said she had run around the lake, and had talked to a homeless man and a woman prior to the attack. She was ashamed of her drug addiction and in denial about it, wanted to protect her family, did not feel what she was doing before the attack was anybody's business, and did not want the police to find her assailant because she did not want him to come back and "finish me up." She told the police she had some alcohol and a little marijuana the night before, but did not mention the crack cocaine.

In her 1997 police interview and at the 2005 trial, Diane said her assailant was an African-American male, and had dark red hair,[1] a natural hairstyle and chipped front teeth. She also told the police in 1997, that he was five feet seven inches tall with a medium build, although defendant was, as indicated post, six feet three inches tall. She testified that she never had consensual sex with defendant. She also was unable to identify him as her assailant in a 2004 lineup or at trial.

---

[1]Diane also acknowledged on cross-examination that she testified at a 2004 preliminary hearing that her assailant had blondish red hair.

After the assault, Diane and her family moved to Sacramento because she was afraid. Her husband left her about 15 months later because Diane had nightmares and would not let him touch her. Diane returned to the Bay Area and continued using drugs and alcohol. Whenever she thought about the rape she blamed herself, and would use more drugs and alcohol until she passed out in order to forget about it. When the police contacted her in 2003, about the assault, she could not recall the incident; she later underwent therapy to regain her memories. She continued to use drugs and alcohol until she entered recovery about 14 months before she testified at trial.

**Physician's Assistant's Testimony**

A physician's assistant, who was a forensics examiner, head of the sexual assault response team (SART) at the hospital, and an expert in sexual assault examinations, examined Diane for two hours after she was admitted at the hospital the same morning as the assault. Diane told her she had been assaulted by an African-American male with reddish hair, had been strangled, and had been beaten on her face and raped; she also admitted to heavy alcohol and crack cocaine use. She had a contusion on the left side of her face, difficulty swallowing, neck pain, cuts on her feet, hemorrhaging in her eardrums consistent with strangulation, broken blood vessels in her eyes, and swelling around her nose and one eye. There were no gross abrasions in her vagina or cervix, but there were numerous sand and dirt particles near her vagina, rectum, and anus. Swabs of her vaginal and rectal areas revealed non-motile sperm. Diane was admitted to the transitory care unit, one of only three percent of sexual assault cases so treated, and discharged three days later.

**Police Investigation**

In late July 1997, a police officer encountered defendant about a mile from the assault and noted he was an African-American man, 26 years old, six feet three inches tall and weighed 190 pounds, with red hair and a moustache.

A forensic DNA analyst testified that in May 2003, evidence relating to Diane's rape was analyzed as part of the "DNA Cold Hit Program." Sperm from Diane's vaginal swab yielded an unambiguous DNA profile, which made it clear it was from a single source, a DNA profile from a male individual. The profile matched that of defendant, by then a convicted offender, in a Department of Justice database. The analyst confirmed the match after obtaining a fresh DNA sample from defendant. She testified that this DNA profile occurred in one out of 608 quadrillion people.

**The 2003 Incident**

The prosecution also contended defendant sexually assaulted D. Doe and A. Doe in 2003.

**Testimony by A. Doe and D. Doe**

A. and D. testified that they were close friends. A. was engaged to, and sexually active with, Jermaine R., D.'s brother; D. was sexually active with a boyfriend, Melvin M.

On the evening of September 6, 2003, D. and A. went to an Oakland dance club called "Sweet Jimmie's." According to A., D. was interested in finding a new boyfriend, which D. denied at trial. On their way, A. had some marijuana and wine cooler; although D. denied it, A. recalled D. had a little of each too.

The women met defendant at the club and danced with him. He seemed to be interested in D., who thought he was nice. The three left the club and went to a store to buy a few things, and defendant suggested they go to his car and smoke marijuana. The women accompanied him on a long walk to an RV and waited as defendant

3

retrieved a key for the vehicle from a nearby apartment. Once in the RV, they talked and the women smoked marijuana and drank wine coolers. D. had spoken to Michael M. on her cell phone during the walk to the RV, and now received a call from Jermaine. The women told defendant they were going to leave. When they declined his offer of a ride home, defendant pulled out a handgun from under a bed and told them to remove their clothes. D. at first refused, complying only after defendant repeated his demand while putting his gun to her head and threatening to shoot her.

Defendant orally copulated both women, ordered each woman to orally copulate him (D. could not recall whether or not she did so), ordered them to orally copulate each other, and ordered A. to kiss D. and rub her breasts. The women did as they were told (although A. faked orally copulating D.). Defendant vaginally penetrated each woman, ejaculating inside each of them. He insisted D. urinate into a bucket after he ejaculated inside her. Defendant vaginally penetrated the women more than once. When he penetrated A., he told her she had gotten his friend locked up and had run away with his money. A. did not know what he was talking about. Defendant ordered A. to lay on top of D. while he attempted to sodomize A., but his penis did not fully penetrate her anus. Each woman testified she did not consent to the sex, but complied out of fear because of the gun.

Defendant allowed the women to leave the RV early that morning, apologized as he accompanied them to a bus stop, and told them not to call the police. On their way home, the women decided to lie and say they were ordered into a car by two men with a gun because they were scared, and worried about how their boyfriends and families would react to the truth. They agreed to tell the truth about what happened in the RV.

When they arrived home, their boyfriends and families were upset with the women, even after they told their story. The women walked to Summit Hospital, where A. told police their story. The women were taken to Highland Hospital for sexual assault examinations. A. identified defendant as their assailant when he was brought to the hospital, and later showed police the RV.

D. admitted she had lied to the police and at the preliminary hearing about two men picking them up, but was telling the truth at trial. A. testified she too had lied to the police, for fear the case would not be pursued if she admitted they had voluntarily gone to the RV.

A. said she was seeing a psychologist and taking anti-depressants. She felt disgusted with men and could not have sexual relations with her fiancé for a year. D. testified that she had seen many counselors and could not have sex for a long time after the attack.

**The Sexual Assault Examinations**

A physician's assistant, a member of Highland Hospital's SART and an expert in sexual assault examinations, testified about her examinations of A. and D. A. told the physician's assistant she had engaged in consensual vaginal intercourse and oral copulation two days before. She said she had been sexually assaulted around midnight the night before by an unknown African-American male in his twenties who had a gun and told her, "I'll blast your head off if you don't shut up." The man had penetrated her vagina and anus and ejaculated in her vagina, they had orally copulated each other, and he had kissed her lips and breasts.

The physician's assistant observed A. had injuries in her vaginal area, specifically a tearing of her fossa navicularis and posterior fourchette, areas where a woman who

4

resists a sexual assault is more likely to have tearing. A. also had bruising and redness in her cervix. The physician's assistant did not perform an anascope in A.'s rectal area because it was too difficult. She observed non-motile sperm on a slide taken from a vaginal swab. She concluded that the results of her exam were consistent with the history A. provided.

D. told the physician's assistant she had last engaged in consensual vaginal intercourse and oral copulation two days before. She said she had been sexually assaulted early that morning by an unknown African-American male in his twenties who had threatened her with a gun to her head and said, "I'll blast your head off if you don't shut up," had penetrated her vagina with his penis and ejaculated, had demanded they orally copulate each other, and had kissed her lips and breasts.

The physician's assistant did not find any deep tears in D.'s vaginal tissue, but found "two to three millimeter nonspecific TB uptake with tenderness and slight erythema."[2]  She also noticed some pooling of a white liquid substance at the posterial vaginal vault.

**The Police Investigation**
Police officers testified they found defendant inside the RV the same morning the attacks were reported and arrested him. Defendant lied about his name, and his appearance matched the description of the suspect as having loose braids, bad teeth, a jacket, and dark pants. The police did not find a gun in the RV. Both A. and D. promptly identified defendant as their attacker in a field lineup.

A DNA analyst testified that D. could not be eliminated as a major donor of DNA found in epithelial cells taken from defendant's penis. D., her boyfriend, and defendant could not be eliminated as sources of DNA found in sperm cells taken from D.'s vaginal swab and in epithelial cells found on her underwear. Defendant was the clear major donor of sperm cells found in the underwear.

Defendant also could not be eliminated as the major donor of a sperm fraction found on the outside of A.'s underwear. A swab of A.'s left breast showed a mixture of epithelial cells of A. and D., and defendant could not be eliminated as a source.

**Testimony of the Sexual Assault Expert**
An expert in sexual assault and rape trauma syndrome testified that rape trauma syndrome has three phases: (1) the acute or crisis phase, (2) the "I'm fine" phase, and (3) the "I'm going crazy" phase. The first typically lasts two weeks to two months. Among other things, victims sometimes initially lie to law enforcement until they develop a trust. Most of the dishonesty involves the beginning portions of the incident that do not involve the assault itself. Victims fear retaliation, blame, not being believed, and getting in trouble. In the "I'm fine" phase, victims commonly repress or block out memories of the assault. In the "I'm going crazy" phase, they address their emotions and feels more in control, but not every woman reaches this final phase.

---

[2]The physician's assistant testified that "nonspecific TB uptake" means the tissue has been disturbed in some way, but that there was not a definite linear tear, a deep tear, or any tear visible to the naked eye.

**The 1999 Incident**[3]

K. Doe, 22 years old at the time of trial, testified that in January 1999, when she was 15, she and a 13-year-old girlfriend met defendant in downtown Oakland. Defendant paid to wash their clothes at a laundromat, and led them to a motel room where he said they could shower. When K. saw defendant was actually trying to break into the room, she and her friend went downstairs to a public restroom; defendant entered the restroom and punched both girls in their faces, knocking out K.'s three front teeth. K. fell and started to bleed and cry.

Defendant ordered the girls to remove their clothes and had sexual intercourse with her friend. Defendant forced K. to orally copulate him. She told him she had a sexual disease, and he did not attempt intercourse with her. Eventually defendant had the girls walk him to Sweet Jimmie's, where he let them go.

K. initially lied and told her brother she had fallen on some metal because she had just run away, but ended up telling her mother about the attack. She told police about defendant's sexual intercourse with her friend, but not that she was forced to orally copulate defendant.

A couple of months later, K. pointed out defendant to police on the street. She later learned he pled guilty to assaulting her and was sentenced to state prison.

In a 1999 interview with police, defendant said he slapped both girls because they had concealed where they actually had money to pay for their laundry. K. was already missing a tooth, and fell against a sink when he hit her, knocking out two others. He had consensual sex with K.'s friend only after she offered to do so, essentially to pay him back for the money he had spent on them, and he was ignorant about her young age.

**Defendant's Case**

Defendant only presented one witness, the owner of the RV, whose testimony was inconsequential to the issues of this appeal. His trial counsel, as suggested in his cross-examinations and/or stated in his closing argument, contended Diane had forgotten she had consensual sex with defendant in return for drugs before she was physically attacked by another person, and insisted A. and D. had lied about their consensual sex with defendant to avoid their families' and boyfriends' wrath. Defense counsel relied heavily on the victims' admitted lies to police in making his arguments.

People v. Ardds, No. A111975, slip op. at 2-10 (Cal. Ct. App. July 27, 2007) (footnotes in original)

(Resp't Ex. E).

**DISCUSSION**

I.   **Legal Standard**

    A.   **Standard of Review for State Court Decisions**

    Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may

---

[3]Petitioner was previously convicted of charges arising from this incident, and none of the charges in the instant case pertained to it. Rather, the evidence of this incident was admitted under California Code Sections 1101(b) and 1108, permitting evidence of Petitioner's prior bad acts and sexual offenses, respectively.

grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits. Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004). It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court. See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

### 1.   Section 2254(d)(1)

Challenges to purely legal questions resolved by a state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of  clearly established Federal law, as determined by the Supreme Court of the United States." Williams (Terry) v. Taylor, 529 U.S. 362, 402-04, 409 (2000). While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards, see Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

### a.   Clearly Established Federal Law

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from

[the Supreme] Court is, at best, ambiguous." <u>Mitchell v. Esparza</u>, 540 U.S. 12, 17 (2003).  If there is

no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the

state court's decision cannot be contrary to, or an unreasonable application of, clearly-established

federal law.  <u>See, e.g.,</u> <u>Stevenson v. Lewis</u>, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether

constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the

rule must be seen as 'established'" by the Supreme Court.  <u>Williams</u>, 529 U.S. at 391.  There are,

however, areas in which the Supreme Court has not established a clear or consistent path for courts

to follow in determining whether a particular event violates a constitutional right; in such an area, it

may be that only the general principle can be regarded as "clearly established."  <u>Andrade</u>, 538 U.S.

at 64-65.  When only the general principle is clearly established, it is the only law amenable to the

"contrary to" or "unreasonable application of" framework.  <u>See id.</u> at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a

particular state court holding is an "unreasonable application" of Supreme Court precedent or to

assess what law is "clearly established."  <u>Clark v. Murphy</u>, 331 F.3d 1062, 1070-71 (9th Cir.), <u>cert.</u>

<u>denied</u>, 540 U.S. 968 (2003); <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600 (9th Cir. 1999).

**b.    "Contrary to"**

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

state court decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts."  <u>Williams</u>, 529 U.S. at 413.  A "run-of-the-mill state-court decision" that

correctly identifies the controlling Supreme Court framework and applies it to the facts of a

prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."  <u>Williams</u>, 529

U.S. at 406.  Such a case should be analyzed under the "unreasonable application" prong of

§ 2254(d).  <u>See</u> <u>Weighall v. Middle</u>, 215 F.3d 1058, 1062 (9th Cir. 2000).

**c.    "Unreasonable Application"**

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

state court identifies the correct governing legal principle from [the Supreme] Court's decisions but

unreasonably applies that principle to the facts of the prisoner's case."  <u>Williams</u>, 529 U.S. at 412-13.

"[A] federal habeas court may not issue the writ simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly established federal law

erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Id.</u> at 411; <u>accord</u>

<u>Middleton v. McNeil</u>, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application

of governing federal law must be not only erroneous, but objectively unreasonable); <u>Woodford v.</u>

<u>Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to

"incorrect" application of law).

     Evaluating whether a rule application was unreasonable requires considering the relevant

rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is

more general, the state courts have more leeway.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664

(2004).  Whether the state court's decision was unreasonable must be assessed in light of the record

that court had before it.  <u>Holland v. Jackson</u>, 542 U.S. 649, 651 (2004) (per curiam).

     The objectively unreasonable standard is not a clear error standard.  <u>Andrade</u>, 538 U.S. at 75-

76 (rejecting <u>Van Tran</u>'s use of "clear error" standard); <u>Clark</u>, 331 F.3d at 1067-69 (acknowledging

the overruling of <u>Van Tran</u> on this point).  After <u>Andrade</u>,

> [t]he writ may not issue simply because, in our determination, a state court's
> application of federal law was erroneous, clearly or otherwise.  While the
> "objectively unreasonable" standard is not self-explanatory, at a minimum it denotes
> a greater degree of deference to the state courts than [the Ninth Circuit] ha[s]
> previously afforded them.

<u>Id.</u>  In examining whether the state court decision was unreasonable, the inquiry may require

analysis of the state court's method as well as its result.  <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1054 (9th

Cir. 2003).

          **2.**    <u>**Sections 2254(d)(2), 2254(e)(1)**</u>

     A federal habeas court may grant a writ if it concludes a state court's adjudication of a claim

"resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  An unreasonable

determination of the facts occurs where a state court fails to consider and weigh highly probative,

relevant evidence, central to a petitioner's claim, that was properly presented and made part of the

state court record.  <u>Taylor v. Maddox</u>, 366 F.3d 992, 1005 (9th Cir. 2004).  A district court must presume correct any determination of a factual issue made by a state court unless a petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding process, or situations in which the petitioner challenges a state court's fact-findings based entirely on the state court record, whereas § 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court.  <u>See</u> <u>Taylor v. Maddox</u>, 366 F.3d 992, 999-1000 (9th Cir. 2004).  In <u>Taylor</u>, the Ninth Circuit established a two-part analysis under §§ 2254(d)(2) and 2254(e)(1).  <u>Id.</u>  First, federal courts must undertake an "intrinsic review" of a state court's fact-finding process under the "unreasonable determination" clause of § 2254(d)(2).  <u>Id.</u> at 1000.  The intrinsic review requires federal courts to examine the state court's fact-finding process, not its findings.  <u>Id.</u>  Once a state court's fact-finding process survives this intrinsic review, the second part of the analysis begins by dressing the state court finding in a presumption of correctness under § 2254(e)(1).  <u>Id.</u>  According to the AEDPA, this presumption means that the state court's fact-finding may be overturned based on new evidence presented by a petitioner for the first time in federal court only if such new evidence amounts to clear and convincing proof a state court finding is in error.  <u>See</u> 28 U.S.C. § 2254(e)(1).  "Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)."  <u>Taylor</u>, 366 F.2d at 1000.

When there is no reasoned opinion from the highest state court to consider the Petitioner's claims, the Court looks to the last reasoned opinion.  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801-06 (1991).  Here, the California Court of Appeal was the highest state court to issue an explained opinion on Petitioner's claims.

**II.    <u>Exhaustion</u>**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies,

either on direct appeal or through state collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b),(c); Granberry v. Greer, 481 U.S. 129, 133-34 (1987).  It is undisputed that Petitioner exhausted his state court remedies as to the first three claims raised in his petition on direct appeal in the state courts.  Respondent contends that the fourth claim is not exhausted, an argument that need not be reached because the claim can be denied on its merits for the reasons discussed below.  See 28 U.S.C. § 2254(b)(2) (allowing district court to deny unexhausted claim on its merits).

## III.    Legal Claims

Petitioner raises four claims in his petition: (1) that the trial court erred in denying his motion to sever trial on the 1997 and 2003 incidents; (2) that the trial court erred in admitting evidence of his prior sex offenses; (3) that the trial court erred in giving an instruction pursuant to CALJIC No. 2.50; and (4) that Petitioner was convicted of the crimes against Diane Doe based on an identification obtained through unconstitutionally suggestive procedure.

### 1.    Severance

Petitioner claims that the trial court violated his right to due process his motion to sever the trial on the 1997 and 2003 incidents.  A joinder, or denial of severance, of counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process.  Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997).  The risk of prejudice from the joinder of two sets of charges is enhanced when the evidence is not cross-admissible, and when the evidence of one crime is substantially weaker than the evidence of the other crime.  Bean v. Calderon, 163 F.3d 1073, 1084-85 (9th Cir. 1998).  Joinder generally does not result in prejudice if the evidence of each crime is simple and distinct even if the evidence is not cross-admissible, and the jury is properly instructed so that it may compartmentalize the evidence.  Id. at 1085-86.  Similarly, joinder generally does not result in prejudice if the jury did not convict on all counts because it presumably was able to compartmentalize the evidence.  Park v. California, 202 F.3d 1146, 1149-50 (9th Cir. 2000).  If the petitioner shows that the joinder violated his right to due process, he must also establish that the joinder had a substantial and injurious effect or influence in determining the jury's verdict.  Sandoval

v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000).

Petitioner argued in the state courts, as he does here, that joint trial of the two incidents rendered the trial unfair because the case on the 1997 incident was stronger and more inflammatory than on the 2003 incident, and that he would not have been convicted of the charges stemming from the 2003 incident if they were tried separately.  (Resp't Ex. at 17.)  He also argues that the evidence of the two incidents would not have been cross-admissible at separate trials.  (Id. at 17, n.5.)  The Court of Appeal rejected Petitioner's argument that the 2003 incident was less inflammatory and weaker than the 1997 incident based on the following reasoning:

> Defendant's "inflammatory" argument amounts to a self-serving interpretation of the facts from the two incidents. He contends the "stranger-on-stranger" nature of the 1997 incident was "more terrifying" than the "acquaintance" nature of the 2003 incident, where the women "had gone with him voluntarily to the place where the alleged offenses occurred," and that the 1997 incident involved "actual violence with strangulation to the point of temporarily being rendered unconscious, with injuries such that a highly-unusual two-night stay in the hospital was required," as opposed to defendant's "brandishing a firearm" in 2003. Defendant also contends Diane's subsequent extended trauma, including her move to Sacramento, divorce, drug use, and memory block, was greater than anything suffered by A. and D.

> Defendant's contentions lack merit. That A. and D. spent a few hours with the defendant and went voluntarily with him to the R.V. does nothing to diminish the substantial terror of their suddenly facing death at his hands. We reject the contention that defendant's threat to kill them by pointing his gun at D.'s head was somehow less significant than his violence against Diane, as brutal as that was; moreover, defendant ignores the "actual violence" of defendant's raping of A. and D., his extended sexual assault of them, and each woman's witnessing, and forced participation in the sexual assault of the other. It is also unpersuasive that Diane suffered a more extensive trauma from the assault. Both A. and D. testified about serious difficulties they had after the assault. Nothing in the record indicates their difficulties were any less meaningful than those Diane faced.

> We are also unpersuaded that the 1997 case was a "sure winner" while the 2003 case was weak. Both cases had their strengths and weaknesses. While the DNA evidence and Diane's testimony provided strong support for the jury's verdict, Diane's inability to identify defendant, her admitted memory block, her initial lies to the police, the lack of obvious signs of force uncovered in her sexual assault examination, the lack of any corroboration for her recitation of events, and her admitted use of crack cocaine and alcohol in the hours prior to the assault posed some problems for the prosecution. On the other hand, the evidence of the 2003 incident included strong indicators that A. and D. were telling the truth, including physical evidence of forced sex found in their sexual assault examinations, each woman's corroboration of defendant's sexual assault of the other, their consistent statements about the assault to the medical staff at the hospital and to the police, their ability to readily identify defendant, and A.'s identification of the RV. The cases were of relatively equal strength.

> Defendant further suggests that, while there was no evidence that Diane voluntarily engaged in sexual relations with defendant, such evidence existed

12

regarding A. and D. because they "went voluntarily with [defendant] to the RV. At least A. must have foreseen some activity beyond conversation and smoking marijuana because she believed [defendant] was trying to pick up [D.]." Defendant also suggests the women were required to fabricate a story to avoid the wrath of their boyfriends and D.'s mother. Defendant's argument is a sad reminder that some may still believe that women who are raped in the course of providing social company to men must have offered themselves sexually or, at the very least, must have "foreseen" the irresistible temptation they presented and were, therefore, somehow responsible for any sexual assault. We reject this view. Just as with Diane, there was no evidence presented at trial that A. or D. had engaged in voluntary sexual relations with defendant

(Id. at 17-19.)

The state appellate court also found the evidence of the two crimes were cross-admissible under California Evidence Code Section 1108, which allows admission of other sexual offenses to show that the defendant had a propensity to commit the charged sexual offense. (Id.) This Court is bound by the state appellate court's determination of state law that the evidence of the two incidents would have been admissible at separate trials. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (holding that state court's interpretation of state law, including one announced on direct appeal of challenged conviction, binds federal court sitting in habeas corpus). The cross-admissibility of the evidence of the two incidents is a strong indication that the joinder did not prejudice Petitioner so as to violate his right to a fair trial as guaranteed by due process.

The state appellate court also explained persuasively why this was not a case in which a weaker case was joined with a more inflammatory and stronger case. The two incidents involved similarly extreme levels of abusive and terrifying conduct by Petitioner. In both incidents, in addition to raping the victims, Petitioner gave them reason to believe he would kill them: in the 2003 incident, he pointed his gun at the victims and threatened to kill them, and in the 1997 incident, he choked the victim to the point of her losing consciousness. Also both incidents involved additional inflammatory conduct by Petitioner: in the 2003 incident, Petitioner raped the victims over a prolonged period of time and forced them to participate in sexually assaulting each other, and in the 1997 incident, Petitioner dragged the victim for a block and beat her in addition to raping and choking her. In short, the 2003 incident was just as terrifying and inflammatory as the 1997 incident. In addition, the evidence in the two cases was of comparable strength. The 1997 incident had very strong DNA evidence, but there were also some weaknesses in that the victim did not

13

1   identify Petitioner, she admitted to memory problems, prior lies to the police, and drug and alcohol

2   use at the time of the incident, and her account of force was not corroborated by physical evidence

3   obtained in the sexual assault examination.  In the 2003 incident there was no persuasive DNA

4   evidence, but the victims gave a positive identification of Petitioner, and their account of the rapes

5   was buttressed strongly by the consistency of their accounts, the physical evidence of force found in

6   the sexual assault examinations, and their prior consistent accounts to the police and medical staff.

7        Based upon this record, the Court of Appeal reasonably concluded that this was not a case in

8   which the joinder of the trial on the two incidents caused undue prejudice.  Consequently, the failure

9   to sever the trial did not render the trial fundamentally unfair, and the state courts' decisions denying

10  Petitioner's claim were not contrary to, or an unreasonable application of, clearly established

11  Supreme Court precedent, nor were they based on an unreasonable determination of the facts in light

12  of the evidence presented.  See 28 U.S.C. § 2254(d)(1),(2).

13       **2.    Admission of Evidence of Prior Sex Offense**

14       Petitioner claims that the admission of evidence of the 1999 incident in which he sexually

15  assaulted two girls, violated his right to due process.  Prior to trial, the prosecution sought admission

16  of the 1999 incident and another incident that occurred in 1997 in which Petitioner had raped and

17  robbed a 26-year-old woman.[4]  The trial court excluded the evidence of the 1997 incident, but

18  admitted the evidence of the 1999 incident under Evidence Code Section 1101(b) to show a

19  "common scheme or plan," and under Section 1108 to show a propensity to commit the charged

20  offenses.[5]

21

22       Petitioner argues that the evidence of the 1999 incident was not admissible under state

23

24       [4]This was a separate incident from the 1997 rape of Diane Doe for which Petitioner was tried
     and convicted in this case.

25
         [5]Section 1101(b) allows "admission of evidence that a person committed a crime, civil
26   wrong, or other act when relevant to prove some fact."  Pursuant to this rule, evidence of previous
     uncharged acts is admissible to prove a "common design or plan," when "the similarity between the
27   circumstances of the prior acts and the charged offenses supports the inference that defendant
     committed the charged offenses pursuant to the same design or plan defendant used to commit the
28   uncharged misconduct." People v. Ewoldt, 7 Cal.4th 380, 393 (1994).
         Section 1108(a) provides: "In a criminal action in which the defendant is accused of a sexual
     offense, evidence of the defendant's commission of another sexual offense or offenses is not made
     inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

14

evidentiary rules.  (Pet. Ex. A at 2-7.)  This argument does not raise a cognizable basis for federal habeas relief because a state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law.  <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984).  Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief. <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991).  In any event, the California Court of Appeal's ruling that the evidence was admissible under state law is binding on federal habeas review.  See <u>Bradshaw</u>, 546 U.S. at 76.

Petitioner also argues that due process prohibits the admission of evidence of prior bad acts to show a propensity to commit the charged offense, as occurred in this case with the admission of the evidence of the 1999 incident pursuant to Evidence Code Section 1108.  (Pet. Ex. A at 7-8.)  The California Court of Appeal rejected this claim, citing Petitioner's concession to the fact that this claim was rejected by the California Supreme Court in an earlier case.  (Resp't Ex. E at 14 (citing <u>People v. Falsetta</u>, 21 Cal. 4th 903, 912-22 (1999).)

The United States Supreme Court has left open the question of whether admission of propensity evidence violates due process.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 75 n. 5 (1991).  Based on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not "clearly established" as required by AEDPA.  <u>Alberni v. McDaniel</u>, 458 F.3d 860, 866-67 (9th Cir. 2006) (citing 28 U.S.C. § 2254(d)(1)); <u>accord</u> <u>Mejia v. Garcia</u>, 534 F.3d 1036, 1046 (9th Cir. 2008) (reaffirming <u>Alberni</u>).  Moreover, the Court notes that with respect to the analogous federal evidentiary rule, the Ninth Circuit has held that it does not violate due process because, as under the California rule, the evidence of the prior offense still is subject to the trial court's balancing test before it is admitted, which provides meaningful review.  See <u>United States v. LeMay</u>, 260 F.3d 1018, 1031 (9th Cir. 2001) (addressing Federal Rule of Evidence 414 (allowing evidence of prior sexual offenses to show a propensity to commit the charged sexual offense)).  In any event, because the Supreme Court has expressly reserved the question of whether using evidence of prior crimes to show propensity for criminal activity could ever violate due process, the state courts' rejection of this claim was not contrary to or an unreasonable application of "clearly established federal law"

under 28 U.S.C. Section 2254(d)(1).  See Larson v. Palmateer, 515 F.3d 1057, 1066 (9th Cir. 2008).

Consequently, Petitioner is not entitled to habeas relief on this claim.

### 3.   CALJIC No. 2.50.01

Petitioner claims that the trial court violated his right to due process by issuing the 2002

version of CALJIC No. 2.50.01.  Petitioner argues that the instruction relieved the prosecution of its

burden of proof beyond a reasonable doubt by allowing the jury to find facts regarding the prior

offenses only by a preponderance of the evidence, and then infer that because Petitioner committed

prior crimes, he committed the charged crimes.

The relevant portion of the 2002 version of CALJIC 2.50.01 states:

> If you find that the defendant committed a prior sexual offense, you may, but
> are not required to, infer that the defendant had a disposition to commit sexual
> offenses.  If you find that the defendant had this disposition, you may, but are not
> required to, infer that he was likely to commit and did commit the sexual offense or
> offenses of which he is accused.
>
> However, if you find by a preponderance of the evidence that the defendant
> committed a prior sexual offense or offenses, that is not sufficient by itself to prove
> beyond a reasonable doubt that he committed the charged crimes.  If you determine
> an inference properly can be drawn from this evidence, this inference is simply one
> item for you to consider along with all the other evidence in determining whether the
> defendant has been proved guilty beyond a reasonable doubt of the charged crime.

(Resp't. Ex. E at 14-15.)

The Due Process Clause of the Fourteenth Amendment protects the accused against

conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

crime with which he or she is charged.  In re Winship, 397 U.S. 358, 364 (1970).  This constitutional

principle prohibits jury instructions that have the effect of relieving the State of its burden of

persuasion beyond a reasonable doubt of every essential element of a crime.  Yates v. Evatt, 500

U.S. 391, 400-03 (1991)

The Ninth Circuit has held that instructing the jury with the 1996 version of CALJIC Nos.

2.50.01 and 2.50.1 violates a defendant's right not to be found guilty except upon proof beyond a

reasonable doubt.  Gibson v. Ortiz, 387 F.3d 812, 822 (2004).  This is because that version of

2.50.01 says that the jury may, but is not required to, infer from evidence of previous offenses that

the defendant committed the crime with which he is charged, and 2.50.1 says that such previous

offenses need be proved only by a preponderance of the evidence, not beyond a reasonable doubt.

16

1  Id. at 821-22.  Together, the instructions allow conviction by a preponderance, rather than requiring

2  proof beyond a reasonable doubt.  Id.

3       However, in this case the jury was instructed with the 2002 revision of 2.50.01, which added

4  the second paragraph quoted above.  The crux of the Gibson decision is that the pre-revision

5  instructions given in that case provided "two routes of conviction, one by a constitutionally

6  sufficient standard and one by a constitutionally deficient one."  387 F.3d at 823.  When it is

7  impossible to know whether a jury used the impermissible legal theory or the one which meets

8  constitutional requirements, the unconstitutionality of one of the routes requires that the conviction

9  be set aside.  Id. at 825.  In this case, the revision to the instruction closed off the constitutionally

10  deficient rout of conviction by clearly instructing the jury that it could *not* find Petitioner guilty

11  beyond a reasonable doubt just because it had found by a preponderance of the evidence that he

12  committed prior bad acts.[6]  The jury is presumed to have followed the instructions.  Weeks v.

13  Angelone, 528 U.S. 225, 234 (2000).  By following the instructions, the jury could not have taken

14  the constitutionally impermissible route to a guilty verdict that Petitioner posits.

15       Petitioner's due process rights were not violated by the use of the 2002 version of CALJIC

16  No. 2.50.1.  Accordingly, the Court concludes that the state court's decision rejecting this claim was

17  not contrary to, or an unreasonable application of clearly established federal law, nor was it an

18  unreasonable determination of the facts in light of the evidence presented.  28 U.S.C.

19  § 2254(d)(1),(2).

20       **4.    Identification Procedure**

21       Petitioner claims that that he was convicted of the 1997 crimes against Diane Doe based on

22  an identification procedure that was unconstitutionally suggestive.  A conviction that rests upon a an

23  identification obtained via suggestive procedures violates due process.  Neil v. Biggers, 409 U.S.

24  188, 196-98 (1972).  Petitioner's claim fails because his conviction for the crimes against Diane Doe

25  did not rest upon any identification of him.  Diane Doe never identified Petitioner as the man who

26  attacked her.  She could not identify him at a lineup in 2004, nor could she identify him at trial.

27

28

---

[6]The Gibson court in fact took note of this revision of the instruction with approval.  Gibson, 387 F3d at 818.

(Resp't Ex. B at 254-57, 299, 311.)  Indeed, Petitioner was not identified as the assailant until his DNA was matched from a database in 2003.  (Id. at 438-42, 448-60.)  Petitioner was convicted based on evidence that the DNA profile from Diane Doe's vaginal swab matched Petitioner's DNA profile, a profile that occurs in one of 608 quadrillion people.  (Id. at 456-60.)  Consequently, Petitioner's conviction did not rest on any unconstitutionally suggestive identification procedures, and his right to due process was not violated.  Petitioner is not entitled to habeas relief on this claim.[7]

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The Clerk of the Court shall enter judgment and close the file.

No certificate of appealability is warranted in this case.  See Rule 11(a) of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (requiring district court to rule on certificate of appealability in same order that denies petition).  Petitioner has failed to make a substantial showing that any of his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial of his claims debatable or wrong.  See Slack v. McDaniel, 529 U.S. 473, 484 (2000).

IT IS SO ORDERED.

DATED: 5/17/10

_Saundra B Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge

---

[7]As this claim fails on its merits, the Court need not address Respondent's alternative argument that the claim is not exhausted.

G:\PRO-SE\SBA\HC.08\Ardds4514.denyHC.wpd18

1

2

3  UNITED STATES DISTRICT COURT
   FOR THE
4  NORTHERN DISTRICT OF CALIFORNIA

5  ANTOINE ARDDS,
                                                    Case Number: CV08-04514 SBA
6           Plaintiff,
                                                    **CERTIFICATE OF SERVICE**
7     v.

8  M.S. EVANS et al,

9           Defendant.

10 ——————————————————————/

11 I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
   Court, Northern District of California.
12

13 That on May 21, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said
   copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said
14 envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
   located in the Clerk's office.

15

16

17 Antione L. Ardds P-59915
   Mule Creek State Prison
18 P.O. Box 409020
   Ione, CA 95640
19

20 Dated: May 21, 2010

21                                     Richard W. Wieking, Clerk
                                       By: LISA R CLARK, Deputy Clerk
22

23

24

25

26

27

28

G:\PRO-SE\SBA\HC.08\Ardds4514.denyHC.wpd19